THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE J. SMITH, Defendant-Appellant.

First District (5th Division) No. 81—2290

Opinion filed December 30, 1982.

Steven Clark and Edward J. Finn, both of Schiff, Hardin & Waite, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean P. Karlos, and Harry John Devereux, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of rape and sentenced to a term of eight years. On appeal, he contends that (1) admission of identification testimony tainted by an unnecessary and highly suggestive showup denied him due process of law; (2) the State's failure to reveal evidence of the showup during discovery denied him due process; (3) the prosecutor's improper comments during closing argument denied him a fair trial; and (4) he was not proved guilty beyond a reasonable doubt.

The victim testified that she left her home at approximately 6 a.m. and began walking down Shields Avenue toward 55th; that it was just between dark and daylight, and the street was illuminated by streetlights; that she noticed a man, whom she later identified as defendant, turn the corner and begin walking toward her along

Shields; that when he was 10 to 15 feet away, she realized that about a week earlier she had seen him near 54th and Shields; that as they passed, she was able to look at his face and also noticed that he was carrying a newspaper under his right arm; that after passing her, defendant grabbed her around the neck from behind and threatened to kill her if she was not quiet; that she dropped her purse, which contained $11, and began screaming and struggling with him; that he put one arm around her neck, covered her mouth with his other hand, and pushed her into a nearby yard where he turned her around so that she was facing him, and then forced her to the ground; that she had a clear view of him until he placed his cap over her face, but thereafter she was still able to see him out of one eye; that he removed her clothing and raped her, with the entire incident taking approximately 20 minutes—during 15 of which she was able to see defendant's face at extremely close range; that after defendant fled, she ran home where her brother called the police—to whom she described her assailant as a black male between 20 and 25 years of age, approximately five feet nine inches tall, weighing about 140 pounds, having large eyes, and wearing dark clothing; and that she was taken by the police to Englewood Hospital, and later she identified defendant in a lineup at the police station.

On cross-examination, the victim acknowledged that she had reviewed police reports which contained her impressions of defendant's height, weight, and facial hair; that the police wrote her initial description on a piece of paper which she had not seen; that the light nearest to the area of the rape was approximately 15 feet away; that she noticed nothing unusual about defendant's mouth other than his large lips; that while she was sitting in a police car at the hospital, a second car arrived with defendant in the back seat; that she was told the police had apprehended someone and was asked to look and see if he was her assailant, but she was not sure; that while at the hospital she had occasion to talk with police officers about the rape and subsequent viewing of defendant; and that the man she later identified in a lineup was the same man she saw in the car at the hospital. She further testified that, at the hospital, she and defendant remained in their respective cars with the windows raised; that there were several people between the cars; and that she did not see defendant standing and was not even sure the man in the car was defendant.

Officer Davis testified that when he talked to the victim at the hospital, she described her attacker as a black male, between 20 and 25, with dark complexion, large eyes and lips, short hairs on his face, and wearing a dark blue cap and a blue jacket; that he and his part-

ners returned to 55th and Shields, where he stopped defendant because he matched the victim's description and was wearing a dark blue cap, light blue jacket, and rust-colored pants; that he took defendant into custody and drove him to Englewood Hospital where the victim was seated in a car, then to the police station, but the only time she was asked to identify defendant was during a lineup at the station; and that defendant lived in one of the houses adjacent to the yard where the rape occurred. He admitted that defendant did not have a newspaper or purse when stopped; that the fact defendant was taken to the hospital before being transported to the station did not appear in the police report; that he drove to the hospital with his two partners and defendant in an unmarked car, but defendant was not viewed there by the victim; that his partner, Officer McGovern, got out of their car and walked to the car where she was seated and talked to someone in the car, but he could not hear what was said; that McGovern subsequently related the conversation to him.

Defendant's sister testified that she saw defendant as he descended stairs in their home at 7:30 a.m. on September 24 and asked whether he had heard a woman screaming at approximately 4 a.m.; and that immediately after this conversation, defendant left the house.

Defendant testified that he was awakened by screams at 6:30 a.m. on September 24, 1980, and upon looking out of the window saw a man and woman who appeared to be struggling; that he went back to bed, but got up between 6:30 and 7 to get ready for school; that as he was leaving the building, he discussed with his sister the screams he heard and the struggle he witnessed, and when he reached the street he saw police officers who called him over and began questioning him; that the officers asked him to take a ride with them "to check something out," and he was taken to a hospital where they pulled up next to another car, and one officer got out and approached that car; that he was told to slide over to the right side of the car, lower the window, and put his head out; that he sat with his head out the window for five or ten minutes; that the officer then returned from the other car and read him his rights before he was taken to the police station; that on September 24, 1980, he had a broken front tooth and had only 13 cents on his person when arrested; that the first time he ever saw the victim was in a car in front of the hospital; and that neither he nor she got out of their respective cars at the hospital.

Opinion

Defendant first contends that failure to suppress the victim's iden-

tification testimony denied him due process of law. He asserts that her identification of him in the lineup and in court was tainted by the hospital showup, which he characterizes as "unnecessary and highly suggestive." The State maintains that what occurred was not a showup; or, alternatively, that it was the type of police procedure recognized as proper in *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605. It also argues that, even if we find that the procedures followed were suggestive, there was a sufficient showing of an independent reliable source for the subsequent identifications.

The State relies on *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454, in arguing that no showup was conducted. There, the police arrived as a rape was taking place, and one officer pursued the assailant while another escorted the victim to a squad car. The defendant was apprehended, and as the police brought him past the car where the victim was seated, she saw him and told the police he was the man who attacked her. The defendant's motion to suppress evidence of this identification was denied, and in affirming we noted that the encounter was unstaged and occurred by mere chance, rather than being arranged by the police for identification purposes. Similar "coincidental confrontations" were found not to constitute showups in *People v White* (1977), 48 Ill. App. 3d 907, 363 N.E.2d 408, and *People v. Brown* (1975), 32 Ill. App. 3d 182, 336 N.E.2d 523.

Nothing in the circumstances of this case indicates any element of coincidence in the confrontation at the hospital. In this respect, it is much closer to the circumstances in *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157, where defendant was arrested several weeks after an armed robbery. The victim was called by the police and asked to come to the station, purportedly to view photographs. When she arrived, the defendant was seated at a desk giving a statement to an officer. According to the victim, she was asked if she noticed the man seated in the outer office when she entered, and she stated that she could not be sure it was the robber, although she subsequently identified him in a lineup. We rejected the State's assertion that this was a chance encounter, noting:

> "The officer's testimony that it had not occurred to him that the witnesses were likely to arrive while he was interviewing the defendant is entitled to little weight. *** [He] called the victims to the station and then proceeded to conduct an interview at a time and in a place where he should have known that the victims would see the accused upon their arrival." 45 Ill. App. 3d 374, 390, 359 N.E.2d 1157, 1169.

Similarly, here, the facts do not suggest that the encounter at

the hospital was by chance. Rather than transporting defendant directly to the police station, he was taken to a place where the police knew, or should have known, the victim would be and placed within her view for a period of time. She testified that she was told to look at defendant and see if he was her assailant. The only possible interpretation is that it was arranged for identification purposes, since no other explanation appears for holding defendant in a police car outside of a hospital. Therefore, what occurred here was not a coincidental confrontation, but a showup.

The State also maintains, however, that even if we find a showup took place, it was justified under the circumstances. Justification has been found where a witness had an excellent opportunity to observe the defendant during the commission of a crime (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313), or where prompt identification of a suspect is made by a witness or victim near the scene of a crime (*People v. McKinley* (1977), 69 Ill. 2d 145, 370 N.E.2d 1040), since, at least in the latter case, such showups are "acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits" (*People v. Lippert* (1982), 89 Ill. 2d 171, 188, 432 N.E.2d 605, 612). Either of these justifications would be applicable to the instant case, since the witness in question had an opportunity to view her assailant for 15 to 20 minutes at extremely close range, and the showup took place near the scene of the crime a very short time thereafter.

Furthermore, after weighing the factors identified in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, *i.e.*, the witness' opportunity to observe the criminal at the time of the crime, her degree of attention, the accuracy of any prior description given by the witness, the level of certainty demonstrated at the confrontation, and the amount of time elapsed between the crime and the confrontation (*People v. McKinley* (1977), 69 Ill. 2d 145, 370 N.E.2d 1040), we find that the State proved by clear and convincing evidence (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152) that the subsequent identifications have sufficient independent origin to establish separate reliability and are thus admissible whether or not the earlier confrontation was suggestive (*People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861).

Initially, we note that the victim had an excellent opportunity to view defendant during commission of the crime, since she was face to face with him in extremely close proximity for 15 to 20 minutes, during which her attention was naturally concentrated on her assailant. We note also that it was daybreak; that the street lights were still on

and gave sufficient light for her to recognize defendant as someone she had seen before when he was 10 to 15 feet from her on the sidewalk; and that there was a light about 15 feet from the place of the crime.

We also note that the victim's description of defendant was quite accurate as to age, height, and weight. Defendant maintains that her description was vague; however, it included such accurate, distinctive characteristics as large eyes and lips, unkempt hair, and strong body odor. Furthermore, we do not find it significant that she did not mention defendant's chipped tooth and described defendant's clothing as dark when, at the lineup, he was wearing rust-colored pants. She stated that she did not consider a chipped tooth unusual, and defendant had sufficient time—given the proximity of his home to the scene of the crime—to have changed his clothing.

■ In considering the victim's level of certainty at the time of the confrontation, we note that while her identification of defendant was positive, both at the lineup and in court, she failed to make an identification at the hospital confrontation. Defendant insists that this factor outweighs all of the others and destroys the reliability of later identifications. Our courts, however, have held in a number of cases that a witness' inability to identify a defendant during earlier and possibly suggestive procedures will not require suppression of subsequent, positive identifications where there was a good opportunity to observe the defendant at the time of the crime. (*People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861; *People v. McCoy* (1979), 78 Ill. App. 3d 157, 397 N.E.2d 79; *People v. Allen* (1978), 60 Ill. App. 3d 445, 376 N.E.2d 1042; *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157.) Furthermore, in the instant case, it appears that the victim's inability to identify defendant at the hospital stemmed from the viewing conditions rather than any uncertainty on her part. She testified that she never saw defendant out of the car; that people were walking between the two cars; and that she was upset and frightened at that time.

■ Finally, we note that while the in-court identification took place almost one year after the crime, the victim's identification of defendant in a lineup took place within a few hours of the crime. Therefore, based on all of the factors discussed, we find that, even if the initial confrontation was suggestive, the State has met its burden of establishing a reliable, independent origin for the subsequent identifications, so that failure to exclude them did not violate defendant's right to due process of law.

Defendant next contends that he was denied due process of law

by the State's failure, during discovery, to reveal evidence of the hospital confrontation. He maintains that such information was material and exculpatory, and therefore subject to disclosure under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The State asserts that defendant has waived this issue, that it did comply with discovery, and furthermore, that defendant did not establish that he was prejudiced by the alleged failure to comply with discovery.

We first consider the State's contention that the issue was waived, since failure to object or raise an issue in a post-trial motion, including an alleged discovery violation, may constitute waiver for purposes of review. (*People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235.) Here, although the issue, as phrased, asserts only one violation, defendant's brief actually complains of the failure to produce two police reports which allegedly contained the victim's initial description of her assailant and evidence pertaining to the confrontation at the hospital.

■ The only reference in defendant's initial brief to the State's failure to produce the paper on which the police allegedly wrote the victim's first description of her assailant appears in a footnote, wherein defendant states: "In addition to evidence concerning the improper show-up, it could reasonably be expected that the street files in this case may reveal other exculpatory evidence including possible discrepancies in Clark's earlier description of Smith ***." Nevertheless, and despite the State's failure to address this passing reference, defendant argued extensively in his reply brief the allegedly prejudicial effect of failure to provide this evidence during discovery. However, we find no reference thereto in defendant's post-trial motion, and the issue is therefore waived. Furthermore, even if the issue had not been waived, there has been no showing of prejudice to defendant. In *People v. Holdman* (1979), 76 Ill. App. 3d 518, 395 N.E.2d 72, there was testimony that a police officer had discarded notes made during his initial interview with the complainant, and we found no prejudice since "[n]othing in the record suggest[ed] that the notes *** would have supplied any different or additional information" (76 Ill. App. 3d 518, 523, 395 N.E.2d 72, 76), and the defendant could not state with certainty that the contents of the notes would have impeached the testimony of any witness. Similarly, here, nothing in the record indicates that there was any discrepancy between what the victim testified was her initial description of defendant and what was written down by the responding officers. Moreover, her testimony is consistent with a later, reported description. Indeed, defendant does not assert that there were discrepancies—only that there might have

been. Since this is unsupported by the record, we cannot find that defendant has been prejudiced.

■ However, the issue as to whether defendant was denied due process by the State's failure to reveal evidence of the hospital showup has been preserved for review. At trial, one ground asserted for suppression of all identification testimony was the State's failure to comply with discovery by producing information concerning the hospital showup. In addition, in his post-trial motion, defendant raised the trial court's failure to grant his motion to suppress, and further argued that the evidence did not support the verdict on the grounds "[t]hat the complaining witness had a suggestive viewing of Defendant prior to the line up and at such time indicated that she was not sure as to identification. That this information was subsequently withheld from the Assistant State's Attorney." While the issue might have been phrased more clearly, we find that the court was adequately apprised of defendant's grounds in seeking a new trial.

Furthermore, it appears from the record that the State did not comply with discovery, as it now maintains. It asserts that two instances on the record prove that it complied—defense counsel's reference to the incident in opening argument, and his failure to refute the prosecutor's statement that the State had turned over police reports referring to the confrontation. We agree that defense counsel obviously had knowledge about the hospital confrontation; but, as he explained in closing argument, this information came from defendant, who was present at the confrontation, and not from the State, and it appears defendant did not know that the victim was then unable to identify him. In addition, the following exchange between the court and counsel indicates that the police reports did not inform defendant of the results of the showup, which was the information of principal interest to defendant:

> "DEFENSE COUNSEL: This information was not made available to me in any police reports or other reports, and it seems the first identification, the first viewing was in the back of a police car. Highly suggestive.
>                              * * *
> COURT: This is the first time the Court has been apprised of this other incident.
> PROSECUTOR: Counsel had police reports which indicate—
> DEFENSE COUNSEL: Its [*sic*] not in the police reports. I'm sorry, counsel. You didn't interrupt me.
> PROSECUTOR: It indicated the police were in their car with the victim and the offender was in a police car at the same

time. We have police reports that indicate that. He knew that and this is no great surprise.

COURT: From what you tell me there's nothing about the complaining witness having made this observation."

It appears to be the State's contention that, if defense counsel knew that the victim and defendant were in separate police cars at the same time, he would somehow know that these cars were parked next to each other. However, even if that were the case, there still would have been no revelation of the fact that the victim was unable to identify defendant at that time.

Since the State did not fulfill its duty to comply with discovery pursuant to Supreme Court Rule 412 (73 Ill. 2d R. 412) and does not contend that defendant failed to properly request this information, we must determine whether defendant was thereby denied due process.

The purpose of discovery is to eliminate surprise and unfairness, as well as to afford defendant an opportunity to investigate, and the usual sanction imposed is compelled compliance. (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 415 N.E.2d 688.) Moreover, even where such evidence comes to light in the midst of trial, its late disclosure may give rise to a due process violation (*People v. Post* (1982), 109 Ill. App. 3d 482, 440 N.E.2d 631); however, on learning of the State's failure to disclose requested information, defendant must take affirmative action (*People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235), and his failure to seek a continuance in order to interview witnesses negates any claim of surprise or unfairness (*People v. Ingram* (1980), 91 Ill. App. 3d 1074, 415 N.E.2d 569). Finally, due process is only violated if the evidence suppressed is material; therefore, "the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial" (*United States v. Agurs* (1976), 427 U.S. 97, 112-13, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402), and if defendant is able to secure and use the information during trial, his "failure to secure this information prior to trial in no way create[s] a reasonable doubt that did not otherwise exist" (*People v. Bivins* (1981), 97 Ill. App. 3d 386, 392, 422 N.E.2d 1044, 1049).

█ In the instant case, defendant has failed to demonstrate any surprise or unfairness in the State's failure to provide the information requested. He knew before trial that the confrontation took place, and failed either to ask the court to compel compliance or to seek a continuance at trial to interview witnesses, thus negating any possible claim of surprise or unfairness. Furthermore, defendant was able to

make full and effective use of the evidence adduced at trial, since the victim admitted that she was unable to identify defendant at the hospital; therefore, we fail to see any way that defendant was prejudiced by the failure to reveal this evidence prior to trial.

Defendant also maintains that improper comments by the prosecutor denied him a fair trial. He asserts that these comments shifted the burden of proof to the defense, relied on facts not in evidence, and misstated the testimony.

A prosecutor is permitted great latitude in his closing argument (*People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017), although statements made therein must be based on evidence presented at trial or reasonable inferences drawn therefrom (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017), but the prosecutor may not properly make comments which shift the burden of proof to the defendant, thus undermining the presumption of innocence (*People v. Belvedere* (1979), 72 Ill. App. 3d 998, 390 N.E.2d 1239), which generally would include comments upon a defendant's failure to call witnesses (*People v. Franklin* (1981), 93 Ill. App. 3d 986, 418 N.E.2d 155). However, defense counsel may not invite or provoke a response and then claim that he was prejudiced thereby (*People v. Dillard* (1979), 68 Ill. App. 3d 941, 386 N.E.2d 416), a principle which applies equally to comments on a defendant's failure to call certain witnesses (*People v. Nash* (1980), 90 Ill. App. 3d 612, 413 N.E.2d 16; *People v. McCann* (1979), 76 Ill. App. 3d 184, 394 N.E.2d 1055). Furthermore, an instruction that closing arguments are not evidence and any statements made in argument not based on evidence should be disregarded "tends to cure possible prejudice from improper remarks" (*People v. Spann* (1981), 97 Ill. App. 3d 670, 678, 422 N.E.2d 1051, 1058), and even improper remarks generally do not constitute reversible error unless they result in substantial prejudice (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200); that is, if they were a material factor in defendant's conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363), such that the verdict would have been different had the comments not been made (*People v. Singletary* (1979), 73 Ill. App. 3d 239, 391 N.E.2d 440).

Defendant complains of two statements made by the prosecutor during rebuttal closing argument, both made with reference to the confrontation between the victim and defendant at the hospital. In the first, the prosecutor argued that defense counsel "had the same police reports that I had, he knew what witnesses were available as well as I did ***, and he has the right to call any witnesses that he so desires." Defendant maintains that this assertion shifted the burden of

proof, relied on reports not in evidence, and misstated the contents thereof.

In his closing argument, defense counsel commented on the State's failure to call the officer who had a conversation with the victim at the hospital, with the implication that his testimony would have been favorable to defendant. This statement can be seen as inviting the response that if defendant wished to call this witness, he could have done so; therefore, the comment in question was not improper. Of course, since the police records alluded to were not in evidence, they should not have been mentioned. However, we cannot see any substantial prejudice to defendant. The prosecutor could have inferred from the evidence presented that defense counsel had this information, since defendant was present at the confrontation and knew who else was there, and Officer Davis testified to the name of his partner who approached the car in which the victim was seated. Finally, although no reports were received in evidence, the record does contain three police documents, including an arrest report, which bear the names of the three arresting officers. Assuming these were among the reports to which the prosecutor made reference, we see no misstatement. Defendant knew he was in the custody of the arresting officers, and these records provided their names.

Turning to the second allegedly improper comment, we consider the following arguments made by the prosecutor:

> "Now [defense counsel] tells you that there was a lack of identification at the hospital. *** [T]hat was not the testimony.
>
> * * *
>
> No one got out of cars. No one asked Minnie Clark [the victim] to identify anyone at the hospital ***.
>
> * * *
>
> She didn't identify him, but they arrested him. That doesn't make any sense. There was no identification at the scene because no one asked Minnie Clark to look at him."

Defendant contends that each of these statements is contrary to the evidence. The first, he argues, gives the erroneous impression that he *was* identified by the victim at the hospital. However, read in context, it is clearly an assertion that this was not a case of failure to identify anyone, because no identification was asked for; thus, it is related to the rest of the statement, which defendant asserts is also contrary to the victim's testimony. We agree; but it is not contrary to the testimony of Officer Davis, another State's witness, who testified that defendant was not viewed by the victim at the hospital and that the only identification she was ever asked to make was at the lineup.

While Davis' testimony was in direct contradiction to the victim's, it was in evidence, and we therefore cannot agree with defendant that there is no evidence to support the prosecutor's description of what occurred at the hospital. Finally, we note that the statement "no one got out of cars" is contrary to the evidence, since even Davis acknowledged that one of his partners approached the car in which the victim was seated. However, we find no substantial prejudice therein, since we doubt that it was a material factor in defendant's conviction such that, had it not been made, the verdict would have been different. Indeed, even if we had found other comments improper, we still would not see any substantial prejudice in the light of the victim's excellent opportunity to view the defendant, her detailed description of him, and subsequent identifications which we have found reliable.

Furthermore, the jury was admonished as closing arguments began and later in an instruction that closing arguments were not evidence and the jury should disregard any statement by either attorney which was inconsistent with the evidence. Both defense counsel and the prosecutor reminded the jury of this admonition at some time during their closing arguments.

Defendant's final contention is that he was not proved guilty beyond a reasonable doubt. He argues that the victim's identification testimony (1) was not shown to have arisen from a source independent of the showup, and (2) was not clear and convincing. Since we have already decided the issue of independent reliability, we need only consider defendant's second argument.

While it is true that, in rape cases, this court will examine the evidence carefully (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907), a positive identification by a single witness who had an adequate opportunity to observe the offender is sufficient to support a conviction (*People v. Berry* (1980), 86 Ill. App. 3d 755, 408 N.E.2d 466) so long as the testimony of the witness is clear and convincing (*People v. Cornes* (1980), 80 Ill. App. 3d 166, 399 N.E.2d 1346), and we will not assume the function of the trier of fact by weighing the credibility of that testimony (*People v. Baseer* (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5) since "[t]he weight to be given testimony regarding identification is a question for the trier of fact. [Citations.] That determination will not be upset unless it is so contrary to the evidence that it cannot be justified." *People v. Smith* (1977), 52 Ill. App. 3d 53, 58, 367 N.E.2d 84, 88.

Here, the victim testified that she had a good view of defendant for 15 to 20 minutes while in close proximity to him. The lighting was sufficient for her to initially recognize him on the sidewalk at a dis-

tance of 10 to 15 feet, and there was a light only about 15 feet from the scene of the offense. Furthermore, she gave an accurate, detailed description of defendant's physical appearance and clothes immediately after the rape. Thereafter, she identified defendant at a lineup and in court. We find this testimony to be clear and convincing.

■ Defendant points to her inability to identify him at the hospital and contends that this raises a reasonable doubt as to his guilt. However, since she did later identify him and he matched the description she gave, the weight to be given her testimony was for the jury as the trier of fact. They found her identification credible, and we cannot say this finding was unjustified. They reasonably could have found that the circumstances at the hospital were not conducive to making a proper identification, since both the victim and defendant remained inside their cars, with the windows raised and people walking between them. Furthermore, the victim testified that she was frightened and upset at that time, which the jury could have found interfered with her perceptions.

For the reasons stated, defendant's conviction is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.